IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| CATHERINE RAYFORD, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19 C 7877 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| LA PETITE ACADEMY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Catherine Rayford, sues defendant, La Petite Academy, Inc. ("La Petite") for terminating her employment following her maternity leave. Plaintiff claims that, in doing so, defendant discriminated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Illinois Human Rights Act, 775 ILCS 5/2-102(I), and retaliated against her for exercise of her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. 2601. This case is before the Court on defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the motion is denied.

I. **Background**

The following is the relevant factual background, viewing the facts in the light most favorable to plaintiff (as the Court must at this stage). *See Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 674 (7th Cir. 2014) ("We do not necessarily vouch for the objective accuracy of all factual statements here, but defendants moved for summary judgment, which requires that we view the evidence in this harsh light."). La Petite is a national educational daycare company with locations across the country, including one in Aurora, Illinois. Plaintiff came to work at La Petite's Aurora school in May 2012. In April 2016, she became the director of that site. As director, she was

responsible for managing the operations of the school and ensuring compliance with La Petite's policies and procedures, state licensing requirements, and other applicable regulations.

In January 2018, plaintiff began to report to a new district manager, Heather Sallay. Shortly afterward, she told Sallay that she was pregnant. In July 2018, plaintiff requested FMLA leave beginning in September, around the time her child was due to be born. On or about July 12, 2018, plaintiff received a letter from the benefits department of La Petite's parent company, Learning Care Group (US) No. 2, Inc., approving her FMLA leave from September 11, 2018, to November 6, 2018.

Following the approval of plaintiff's FMLA leave, plaintiff and Sallay discussed how the school would cover plaintiff's absence. At that time, Alexandria Gallagher was the site's School Education Manager, a position similar to an assistant director. Neither Sallay nor plaintiff was confident that Gallagher was competent to fill in as an acting director while plaintiff was on leave. Plaintiff testified at her deposition that she was "uneasy" about leaving the school if it meant leaving it in Gallagher's hands. (Pl.'s LR 56.1 Resp. ¶ 18, ECF No. 60.) Sallay was likewise concerned (*id.*), and plaintiff testified that Sallay told her, "you leaving is not a good thing" (*id.* ¶ 18). Based on these concerns, Sallay asked Jennifer Theobald to oversee operations at the Aurora school while plaintiff was on leave. Theobald was the director of a La Petite school in nearby Plainfield, Illinois, and she had previously assisted in covering for other directors on maternity leave.

After plaintiff gave birth on September 7, 2018, she began her leave (a few days earlier than planned). When Theobald began filling in at the Aurora school, she noticed several potentially serious violations of La Petite policies. First, the infant classrooms were overenrolled. A May 8, 2017 letter from the Illinois Department of Children and Family Services ("DCFS") listed the

maximum capacity of Room 2, an "infant/toddler" classroom, as "8*." Next to an asterisk at the bottom of the page was a note: "Room 2 is limited to 4 infants due to the room[']s square footage." (*Id.* ¶¶ 30-32; Def.'s LR 56.1 Stmt. Ex. 2, Pl.'s Dep. Ex. 9, ECF No. 54-1 at 217.) Plaintiff admits that she overlooked the asterisk and accompanying note, and she mistakenly overenrolled the infant rooms. Plaintiff and Sallay knew of this mistake prior to plaintiff's maternity leave, and they had a conversation about it. In consultation with another La Petite employee sent to help her sort out the scheduling, plaintiff compensated for the error by rotating some of the older children enrolled in the infant rooms into other rooms with excess capacity, so the number of children in the infant rooms never exceeded the DCFS capacity limit on any particular day.

Next, Theobald discovered that children were bringing in outside food to eat during the school day. A written La Petite policy prohibited children from bringing in outside food without a written note from a physician explaining why the child could not eat the food La Petite provided and what the child could or should eat instead. According to Theobald, the policy was rooted in DCFS requirements and was to be strictly enforced. Theobald found that some children were bringing in outside food without a doctor's note, sometimes for no reason other than because they preferred to eat their own food. On one occasion, she noticed a child eating food from McDonald's. Upon inquiring, Theobald was told that this was a regular practice for this child, and that plaintiff had known about it. According to plaintiff, children had been bringing in their own meals with doctor's notes since before she became director. She recalls noticing that a child had brought in McDonald's once, and she told the child's mother, "you probably shouldn't be bringing in McDonald's," but took no further action. (Def.'s LR 56.1 Stmt. Ex. 2, Pl.'s Dep. at 103:8-9.)

Theobald also found that staff were transporting children without proper authorization. For one thing, she noticed an employee leaving the Aurora school at the end of a workday in her

3

personal vehicle with one of the school's students. Under La Petite policy, employees could not transport students to or from school without obtaining authorization for after-hours babysitting from the district manager and submitting an authorization form and other appropriate paperwork. When Theobald asked Gallagher and another school employee whether this employee had babysitting authorization paperwork on file, they told her that they did not know anything about such paperwork. Plaintiff knew about this situation prior to her maternity leave, and she told the employee that she should not be transporting the child and needed to find another arrangement, but she took no other action.

Additionally, before an employee is permitted to transport children in a company-owned bus or van, La Petite administrators must obtain a motor vehicle records check and seek clearance from DCFS. Theobald found that only two of approximately six people who transported children in company-owned buses or vans for the Aurora school had the requisite DCFS clearance paperwork on file. Plaintiff admits that one driver did not have a proper clearance due to an error plaintiff had made, submitting the DCFS clearance to the wrong place. However, according to plaintiff, that driver was no longer actually driving students, nor were any uncleared drivers driving students.

Finally, just prior to plaintiff's maternity leave, plaintiff emailed Sallay for authorization to offer a 20% discount to an employee known as Rebecca so that she could enroll her children in the school. Sallay approved the discount, and Rebecca's children began to attend the school. However, the children were never entered into La Petite's system, and Rebecca was never charged any tuition at all. Plaintiff testified that Gallagher told her that she had entered Rebecca's children into the system; plaintiff admits that she did not go back and check.

Shortly after plaintiff returned from maternity leave in November 2018, Sallay and plaintiff met to discuss the policy violations Theobald had uncovered. Plaintiff was subsequently placed on administrative leave. Sallay decided to terminate plaintiff for the "amount of policy violations" that had occurred on her watch, as well as the "type of policy violations," which included "fraudulent" misconduct and mismanagement that would have put "children and the school at risk." (Def.'s LR 56.1 Stmt. Ex. 11, Sallay Dep. at 61:20-23, ECF No. 54-1 at 422.)

When asked at her deposition why she decided on termination rather than a warning or a performance improvement plan, Sallay testified that it was because she believed plaintiff was "aware that she was violating these policies" and the violations were "severe." (*Id.*, Ex. 11, at 62:3-7, 63:10-15.) Allowing Rebecca's children to attend for free was a particularly "severe" violation, Sallay explained, because it amounted to "committing fraud," and protecting against "fraudulent revenue loss" is one of a site director's "main core job" functions. (*Id.*, Ex. 11, at 62:3-7, 63:10-15; *see also id.*, Ex. 1, Sallay Decl. ¶¶ 14-15 (reciting the above-described policy violations[1] as the reasons for terminating plaintiff's employment and characterizing them as "commit[ing] fraud, jeopardiz[ing] the Aurora School, and risk[ing] the safety of children.")

## II. Legal Standards

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court may not

---

[1] In her declaration, in addition to the above-described policy violations, Sallay also suggests that plaintiff gave Rebecca a higher-than-authorized discount. Plaintiff denies this, although she admits that she mistakenly gave Gallagher a higher employee discount than she was entitled to at the time. (*See* Pl.'s LR 56.1 Resp. ¶¶ 48-49.)

5

weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013). The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016).

Title VII makes it "an unlawful employment practice for an employer . . . to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In other words, "Title VII prohibits job-related actions that are motivated by intentional discrimination against employees, based on protected employee statuses such as race or sex." *Ernst v. City of Chi.*, 837 F.3d 788, 794 (7th Cir. 2016).

The Pregnancy Discrimination Act amended Title VII to "clarify that pregnancy discrimination is included in Title VII's prohibition on sex discrimination." *Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1154 (7th Cir. 1997). As amended by the Pregnancy Discrimination Act, Title VII defines "the terms 'because of sex' or 'on the basis of sex'" to include "because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes." 42 U.S.C. § 2000e(k). Similarly, the Illinois Human Rights Act makes it a "civil

rights violation" for employers to discriminate against employees, including by deciding to discharge them, "on the basis of pregnancy, childbirth, or medical or common conditions related to pregnancy or childbirth." 775 ILCS 5/2-102(I). "Both statutes . . . are interpreted in the same manner." *Frey v. Hotel Coleman*, 141 F. Supp. 3d 873, 879 n. 4 (N.D. Ill. 2015).

In assessing whether a Title VII claim survives summary judgment, "there is a single inquiry," *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017), which is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's . . . sex . . . or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see id.* at 764 ("[T]he sole question that matters [is] [w]hether a reasonable juror could conclude that [the plaintiff] would have kept his job if he had [not been a member of a protected class] and everything else had remained the same."). "However the plaintiff chooses to proceed," *i.e.*, whether he relies on direct or circumstantial evidence or a combination of the two, "at the summary judgment stage the Court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action *because of* her [sex or other protected trait]." *Carson v. Lake Cty., Ind.*, 865 F.3d 526, 533 (7th Cir. 2017); *see David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("In adjudicating a summary judgment motion, the question remains: has the [plaintiff] produced sufficient evidence to support a jury verdict of intentional discrimination?").

The FMLA guarantees eligible employees of a covered employer the right to take unpaid leave for a period of up to twelve weeks because of the birth of a child. *See* 26 U.S.C. § 2612(a)(1)(A). Upon return from FMLA leave, employees must be restored to the same position or an equivalent one, with the same benefits and terms of employment. *King v. Preferred Tech.*

7

*Grp.*, 166 F.3d 887, 891-92 (7th Cir. 1999) (citing 26 U.S.C. § 2614(a)). It is unlawful for any employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 26 U.S.C. § 2615(a)(1). The FMLA's implementing regulations provide that the FMLA's "prohibition against interference prohibits an employer from discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). Further, "employers cannot use the taking of FMLA leave as a negative factor in employment actions." *Id.*

The Court generally "evaluate[s] a claim of FMLA retaliation the same way that [it] would evaluate a claim of retaliation under other employment statutes, such as . . . Title VII." *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). An FMLA plaintiff must adduce evidence that "(1) he engaged in a protected activity; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the protected activity and the adverse employment action." *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012). "To succeed on a retaliation claim, the plaintiff does not need to prove that retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Goelzer v. Sheboygan Cty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010) (internal quotation marks omitted).

### III.     Discussion

To determine whether plaintiff's pregnancy discrimination and FMLA claims survive summary judgment, the Court must consider the evidence as a whole to determine whether the full evidentiary picture permits a reasonable inference that plaintiff's sex, pregnancy, or maternity leave caused defendant to treat plaintiff differently. *See Ortiz*, 834 F.3d at 765; *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). The Court asks whether a reasonable juror

could conclude that plaintiff would have kept her job if she had never become pregnant or taken maternity leave, but everything else had remained the same. *See Ortiz*, 834 F.3d at 764.

Plaintiff does not allege that she suffered any discriminatory treatment or adverse employment action during her pregnancy, apart from Sallay's comment that plaintiff's upcoming maternity leave was "not a good thing." The adverse action she complains of is her termination shortly after returning from maternity leave.[2]

Defendant argues that a reasonable juror could not find in plaintiff's favor based only on the timing of her termination following her return from maternity leave, and, according to defendant, plaintiff's claims are based on nothing more than that timing. The Court takes this argument in two parts, first considering the timing and then considering whether there is other evidence that might support a jury verdict in plaintiff's favor.

### A. *Suspicious Timing*

Suspicious timing is rarely enough, by itself, to prove that an intent to discriminate or retaliate caused an adverse employment action. *See Silk v. Bd. of Trs., Moraine Valley Cmty. Coll. Dist. No. 524*, 795 F.3d 698, 710 (7th Cir. 2015). Timing alone may suffice to prove causation, however, where the adverse action follows "close on the heels of a protected act." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011). There is "no set legal rule for determining

---

[2] Defendant does not argue that the fact that plaintiff was no longer pregnant at the time of the adverse employment action defeats plaintiff's claim of pregnancy discrimination. Because defendant does not make the argument, the Court need not determine whether it would have succeeded, but it seems dubious:

> It is settled under Title VII that an employer may not discharge an employee based on the categorical fact of her pregnancy. By the same token, since a short-term inability to work is bound up with the very nature of pregnancy and childbirth, that disability is a pregnancy-related condition within the meaning of 42 U.S.C. § 2000e(k), and Title VII thus prohibits an employer from dismissing an employee in retaliation for taking an authorized maternity leave.

*Smith v. F.W. Morse & Co.*, 76 F.3d 413, 424 (1st Cir. 1996) (internal case citations omitted).

whether an adverse employment action falls 'close on the heels' of protected activity because such a determination 'depends on context.'" *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (citing *Loudermilk*, 636 F.3d at 315). "The closer [the] two events are, the more likely that the first caused the second." *Loudermilk*, 636 F.3d at 315. Generally, for suspicious timing alone to permit an inference of causation, the adverse action must come within days of the protected activity. *See Kidwell*, 679 F.3d at 966-67 (citing cases). If there is other evidence supporting the inference, the timing of the adverse action may be suspicious even if it comes a few weeks or even longer after the protected activity, depending on context. *See Coleman v. Donahoe*, 667 F.3d 835, 860-62 (7th Cir. 2012).

Defendant argues that the timing here is not suspicious because defendant knew of plaintiff's pregnancy and of her intention to take maternity leave months before she even began her leave, let alone returned from it, and it was only after plaintiff returned to work that she suffered any adverse action. But the Court does not agree that the adverse action had to be close in time to plaintiff's initial request for maternity leave to be suspicious. Defendant does not cite any authority for that proposition, and, at least as it would apply to this case, it strikes the Court as inconsistent with the Seventh Circuit's context-based approach to suspicious timing. *See Loudermilk*, 636 F.3d at 315.

Courts have used various different measures of timing to assess whether an adverse action is suspiciously timed in relation to a protected leave, and at least three circuits have measured the time between the expiration of the employee's protected leave and the adverse action, rather than the time between the employee's request for leave and the adverse action. *See Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1272 (11th Cir. 2017) (citing *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 410 (6th Cir. 2014), and *Amsel v. Texas Water Dev. Bd.*, 464 F.

10

App'x 395, 401 (5th Cir. 2012)); *contra Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012). In a recent decision, a district court in this circuit has suggested that courts need not assume that only one approach or the other is correct: an adverse action might closely follow a request for protected leave; and another adverse action might closely follow the taking of protected leave; and the timing might be equally suspicious in both cases, because in both cases the adverse action closely follows protected activity. *See Applewhite v. Deere & Co., Inc.*, No. 18 CV 4106, 2020 WL 7029889, at *22 (C.D. Ill. Nov. 30, 2020).

The Court finds the *Applewhite* court's approach apt, given the Seventh Circuit's emphasis on context in assessing whether timing is suspicious. Following that approach, the Court considers the timing here very suspicious indeed because the adverse action came "close on the heels of a protected act," *i.e.*, taking maternity leave. *See Loudermilk*, 636 F.3d at 315; *Kidwell*, 679 F.3d at 966.

In support of its position, defendant cites two cases, *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 634 (7th Cir. 2009), and *Kohls v. Beverly Enterprises Wisconsin, Inc.*, 259 F.3d 799, 806 (7th Cir. 2001), which stand for the proposition that "the fact that the leave permitted the employer to discover the problems cannot logically be a bar to the employer's ability to fire [a] deficient employee." *Kohls*, 259 F.3d at 806. That proposition does not aid defendant because, considering the course of events here in their full context, the fact that the adverse action came at the conclusion of plaintiff's maternity leave rather than at the time plaintiff requested it does not make the timing less suspicious. This is because, as the Court will explain in more detail below, the evidence is susceptible of the interpretation that "the employer lay in wait for an employee who had [engaged in protected activity], firing [her] as soon as a plausible pretext presented itself." *See Lawton v.*

11

*Weil Foot & Ankle Inst., LLC*, No. 17 CV 00297, 2021 WL 492899, at *4 (N.D. Ill. Feb. 10, 2021) (citing, *inter alia*, *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 n.6 (7th Cir. 1996)).

### B. *Other Evidence*

In addition to suspicious timing, other types of circumstantial evidence that may support an inference of discriminatory or retaliatory intent include "ambiguous statements" and "evidence that the employer offered a pretextual reason for an adverse employment action." *Coleman*, 667 F.3d at 860. The Seventh Circuit has recognized that, where the evidence of suspicious timing is not strong enough alone to get the plaintiff over the summary judgment hump, combining it with evidence of pretext may create a genuine issue of fact. *See Coleman*, 667 F.3d at 860-62; *see also Haworth v. Round Lake Area Sch., Cmty. Unit Sch. Dist. 116*, No. 17 C 7038, 2019 WL 3080928, at *6-8 (N.D. Ill. July 15, 2019).

To demonstrate that an employer's given reason for an adverse employment action was a pretext for an unlawful motive, an employee must demonstrate not just "faulty reasoning or mistaken judgment on the part of the employer," but that the employer's reason is a "lie, specifically a phony reason" for the adverse employment action. *Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 506 (7th Cir. 2017) (internal quotations marks omitted). The employee may make the requisite showing by, for example, pointing to evidence that the proffered reason is "factually baseless" or "insufficient to motivate" the employer's action. *Id.* (internal quotations marks omitted). Just as context is essential to determining whether the timing of an adverse action is suspicious, context is "essential to determine whether an employer's explanation is fishy enough to support an inference that the real reason must be discriminatory." *Loudermilk*, 636 F.3d at 315; *see id.* ("The Civil Rights Act of 1964 does not require employers to have just cause for sacking a

worker, but an employer who advances a fishy reason takes the risk that disbelief of the reason will support an inference that it is a pretext for discrimination.").

Plaintiff argues that defendant's reasons for terminating her were pretextual because they were insufficient to motivate her termination. In assessing plaintiff's argument, the Court is mindful that it "does not sit as a super-personnel department, second-guessing an employer's business decision as to whether someone should be fired." *Coleman*, 667 F.3d at 862 (internal quotation marks omitted). But it is equally mindful that "the persuasiveness of the defendant's explanation is normally for the finder of fact to assess, unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point." *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) (internal quotation marks omitted). District courts should grant summary judgment only "if the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff" even if the plaintiff had not engaged in protected activity. *Id.*

Here, the Court is hard-pressed to say that a finder of fact would be "*compelled* to credit the employer's case on this point." *Id.* (emphasis added). The trouble is that the evidence does not establish any compelling reasons why defendant took the drastic step of firing plaintiff, instead of taking some lesser disciplinary action against her. When asked that question at her deposition, Sallay answered that she fired plaintiff because plaintiff "was aware that she was violating policies." (Sallay Dep. at 62:3-7, 63:10-15.) But plaintiff claims that she did not knowingly commit any of the policy violations defendant has cited as its reasons for terminating her, nor did she condone them; in fact, she tried to correct those that she knew about. Her position is that (1) she misread the DCFS letter stating the capacity of the infant rooms, overenrolled them by accident, and she was handling the situation by rotating children out of the infant rooms and into rooms with

13

excess capacity; (2) she knew of one employee who was transporting a student, and she told the employee to stop doing it; (3) she did not permit students to bring in food without a doctor's note, and when she saw a parent bring in McDonald's, she told the parent that she shouldn't be doing that; (4) she believed only one of her drivers did not have the requisite DCFS clearance, and that driver was no longer driving students; and (5) she believed Gallagher had input Rebecca's children into the system because Gallagher told her she had. (*Cf.* Sallay Decl. ¶¶ 14-15.) Further, plaintiff claims that Sallay knew of at least some of these issues (particularly the infant room issue) before plaintiff went on maternity leave. (*See* Pl.'s Dep. at 142:17-21.) A reasonable juror could believe plaintiff and conclude that, contrary to what Sallay had said, plaintiff did not knowingly flout policies. If not, that juror could conclude that plaintiff's misconduct was insufficient to motivate the decision to terminate her. *Scheidt v. Floor Covering Assocs., Inc.*, No. 16-CV-5999, 2018 WL 4679582, at *11 (N.D. Ill. Sept. 28, 2018) ("Defendant may of course present its policies to the trier of fact . . . . It will be for the trier of fact to determine whether all the evidence together indicates that Defendant's claimed reason for terminating Plaintiff was a pretext."); *Taylor v. Metro. Water Reclamation Dist. of Greater Chi.*, No. 15-CV-7855, 2020 WL 1503642, at *12 (N.D. Ill. Mar. 30, 2020) (denying summary judgment where there were factual disputes over the basis for the plaintiff's termination).

The Court is unable to say that no reasonable juror would find it fishy that defendant would fire an employee with an unblemished record for what amounted to bureaucratic missteps that, while perhaps serious, had not yet caused any tangible or irreparable harm. That these missteps were serious enough to warrant termination rather than lesser discipline was apparently a subjective decision of Sallay's, and when an employer relies on subjective criteria, it leaves itself vulnerable to a factfinder's inference that its given reason for the decision was a pretext for an

14

unlawful motive. *See Guinto v. Exelon Generation Co., LLC*, 341 F. App'x 240, 246 (7th Cir. 2009) (citing *Rudin v. Lincoln Land Cmty. Coll.,* 420 F.3d 712, 727 (7th Cir. 2005), *Giacoletto v. Amax Zinc Co.,* 954 F.2d 424, 427-28 (7th Cir. 1992), and *Bell v. EPA,* 232 F.3d 546, 551-52 (7th Cir. 2000)).

Finally, there is one other piece of circumstantial evidence supporting an inference that defendant acted with discriminatory or retaliatory intent: plaintiff has testified that Sallay was displeased about having to find cover for plaintiff's maternity leave, telling her that "you leaving is not a good thing." (Pl.'s LR 56.1 Resp. ¶ 18.) Combining this detail with the evidence of suspicious timing and pretext, a reasonable jury could conclude that the evidence, considered as a whole, is fishy enough to support an inference of discrimination or retaliation. *See Owens v. Chi. Bd. of Educ.*, 867 F.3d 814, 816 (7th Cir. 2017); *Applewhite*, 2020 WL 7029889, at *22.

The Court acknowledges that it may be that plaintiff did not knowingly violate company policy or connive at staff members' violations of policy, *and* that Sallay's decision to fire her was not infected by discriminatory or retaliatory intent: it might also be that Sallay genuinely but mistakenly believed that plaintiff knowingly violated company policy. If so, then defendant wins this lawsuit. *See Culver*, 416 F.3d at 547 ("[T]he issue before us is not whether an employer's evaluation of the employee was correct but whether it was honestly believed."). But there is a genuine material factual dispute over the reason for plaintiff's termination, and a jury trial, not summary judgment, is the way to determine whom to believe.

## **CONCLUSION**

Defendant's motion for summary judgment [53] is denied. A status hearing is set for July 8, 2021. The parties shall confer regarding the possibility of settlement and the scheduling of next steps, and they shall file a joint status report by July 6, 2021.

**SO ORDERED.**                                    **ENTERED: June 4, 2021**

_____
**HON. JORGE ALONSO
United States District Judge**